IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| KATRINA ROSA, SHERYL BISHOP, TAMEY DONNELLY, PHILIP ROY AND ANNA SILVA, | ) ) ) ) ) | |
| Plaintiffs | ) ) ) ) ) | |
| vs. | ) ) | No. _ |
| THE MONADNOCK COMMUNITY HOSPITAL (MCH), | ) ) ) ) | |
| Defendant | ) | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiffs Katrina Rosa, Sheryl Bishop, Tamey Donnelly, Philip Roy and Anna Silva, by and through their undersigned counsel, Red Sneaker Law, PLLC, as and for their respective claims against The Monadnock Community Hospital (MCH), hereby allege:

**Preliminary Statement**

1.      This is a civil rights lawsuit brought, primarily, under the Americans with Disabilities Amended Act by three families in order to end more than two decades of discrimination by the only major medical facility in an isolated part of New Hampshire.  In short, despite past lawsuits and settlements, Defendant Monadnock Community Hospital has failed, again and again, to provide equal communication access to Deaf and Hard-of-Hearing patients and their families.

## JURISDICTION

2.      This Court has Federal Question Jurisdiction pursuant to 28 USC § 1331, as this action is based upon two important federal statutes: the Americans with Disabilities Act, Title II, 42 USC § 12131 *et. seq*. and Title III, 42 USC § 12181 *et. seq*. and the Rehabilitation Act, 29 USC §794, Section 504.

3.      The Plaintiff requests that this Court exercise supplemental jurisdiction over the State court causes of action named herein as they arise from the common nucleus of operative facts. 28 USC § 1367.

## VENUE

4.      Venue is proper in the United States District Court for the District of New Hampshire pursuant to 28 USC §1391(b) and (c) as the Defendant's medical facility is based in New Hampshire, Plaintiffs were at all relevant times, and are currently New Hampshire residents and the core nucleus of operative facts occurred within this venue.

## JURY TRIAL DEMANDED

5.      Plaintiffs demand a trial by jury on each of the causes of action.

## PARTIES

6.      Defendant The Monadnock Community Hospital (MCH) is a New Hampshire nonprofit corporation, located 452 Old Street Road, Peterborough, County of Hillsborough, State of New Hampshire and is a critical access hospital.  Further, MCH is a "public accommodation" as defined in 42 U.S.C. § 1281(7)(F) and its implementing regulation, 28 C.F.R. § 36.104 because it is a private entity that operates a place of public accommodation, specifically, a hospital.

7.      Plaintiff Katrina Rosa is the Child of Deaf Adult (CODA) Plaintiff Sheryl Bishop and resided, at all material times, at 1412 Forest Road, Greenfield, NH, 03047.

8.      Plaintiff Sheryl Bishop, Plaintiff Katrina Rosa's mother, is profoundly, prelingually deaf and resided, at all material times, at 1412 Forest Road, Greenfield, NH, 03047.  Ms. Bishop is an individual with a disability within the meaning of ADA, 42 U.S.C. § 12102(1) and its implementing regulation at 28 C.F.R. Part 36 as Ms. Bishop is prelingually deaf and communicates, primarily, via American Sign Language.

9.      Plaintiff Tamey Donnelly, spouse of Plaintiff Philip Roy, is profoundly, prelingually deaf and resided, at all material times, in West Peterborough, New Hampshire.  Ms. Donnelly is an individual with a disability within the meaning of ADA, 42 U.S.C. § 12102(1) and its implementing regulation at 28 C.F.R. Part 36 as Ms. Donnelly is prelingually deaf and communicates, primarily, via American Sign Language.

10.      Plaintiff Philip Roy, Spouse of Plaintiff Tamey Donnelly, is profoundly, prelingually deaf and resided, at all material times, in West Peterborough, New Hampshire.   Mr. Roy is an individual with a disability within the meaning of ADA, 42 U.S.C. § 12102(1) and its implementing regulation at 28 C.F.R. Part 36 as Mr. Roy is prelingually deaf and communicates, primarily, via American Sign Language.

11.      Plaintiff Anna Silva is profoundly, prelingually deaf and resided, at all material times, at 172 Exeter River Landing, Exeter, New Hampshire.  Ms. Silva is an individual with a disability within the meaning of ADA, 42 U.S.C. § 12102(1) and its implementing regulation at 28 C.F.R. Part 36 as Ms. Silva is prelingually deaf and communicates, primarily, via American Sign Language.

## FACTS

## MONADNOCK COMMUNITY HOSPITAL'S PREVIOUS SETTLEMENTS

12.     Monadnock Community Hospital ("MCH") is a critical access point hospital and it is also

the hospital the Deaf and Hard-of-Hearing Community of New Hampshire try to avoid, at

almost, all costs.  MCH has a long, and well documented, history of failures in providing

communication access to deaf and hard-of-hearing patients and their families.  These failures,

including the plaintiffs' stories, stories of three families, all different, but all with the same theme

of a hospital that simply doesn't care, begin more than a decade ago with another lawsuit and

another deaf patient denied communication access.

13.     In 2010, the United States Department of Justice began investigating the complaints of

Amy Dauphinais, a deaf woman who had alleged MCH failed to provide her with appropriate

communication access, required her to use inadequate or inappropriate auxiliary aids, and used

her minor daughter as an interpreter while she was an MCH patient.

14.     In 2013, MCH and the United States Department of Justice settled the Dauphinais case.

As part of the settlement, MCH agreed to establish a program to ensure it would provide

effective communication to deaf and hard-of-hearing patients in the future. Whatever changes

MCH may have implemented to end its quarrel with the Federal Government, it is clear, from the

facts below that MCH has failed to continue them.

15.     In the Dauphinais settlement agreement, MCH agreed, among other things, to:

    a)  appoint two or more Program Administrators to answer questions and provide

        appropriate assistance regarding immediate access to and proper use of appropriate

        auxiliary aids and services required by the settlement agreement.  These

administrators were to be available 24/7 to provide immediate access to appropriate Auxiliary Aids and Services.

b) extend all polices regarding communication access to not just patients but those deaf and hard of hearing individuals accompanying a patient.

c) make no fewer than 5 attempts, no more than 15 minutes apart, to locate an interpreter and provide one within 1 hour at least 80% of the time when an American Sign Language (ASL) interpreter was required.

d) make a determination of the need for an auxiliary aid or service at "the time the Patient or Companion initially comes in contact with Hospital Personnel." And this determination was to be documented as part of each initial Patient assessment and made part of the Patient's medical record.

e) develop a form to conduct a determination, made by trained personnel in consultation with the deaf patient or companion, as to whether and what auxiliary aid or service ("AAS") was appropriate that would take into account all the relevant facts and circumstances, including without limitation:

   i. the nature, length and importance of the communication at issue;

   ii. the individual's communication skills and knowledge;

   iii. the Patient's health status or changes thereto;

   iv. the Patient's and/or Companion's request for or statement of need for an interpreter or other specific auxiliary aid or service;

   v. the reasonably foreseeable health care activities of the Patient (e.g. group therapy sessions, medical tests or procedures, rehabilitation services, meetings

with health care professionals or social workers, or discussions concerning billing, insurance, self-care, prognoses, diagnoses, history and discharge); and

vi. the availability at the required times, day or night, of Appropriate Auxiliary Aids and Services.

f) provide "qualified oral interpreters to such Patients and Companion who rely primarily on lip reading…"

g) provide a qualified interpreter to obtain a medical history, get informed consent, explain diagnosis, prognosis and current condition, explaining tests and procedures.

h) engage in, if a patient or companion indicated an Auxiliary Aid or Service was ineffective, a documented redetermination as to the appropriate Auxiliary Aid or Service.

i) maintain a log documenting:

i. each request for an appropriate Auxiliary Aid and Service;

ii. the type of auxiliary aid or service requested;

iii. the time and date the request was made;

iv. the name of the patient or companion making the request;

v. the name of the MCH personnel who performed any communication determination or redetermination;

vi. the name of the MCH personnel responsible for determining whether or not to provide the requested appropriate Auxiliary aid or service;

vii. the nature of the auxiliary aid or service provided;

viii. the time and date the AAS was provided or a statement as to why it was not provided.

16.     Further, the Settlement Agreement required the working assumption that a live, on-site ASL interpreter would be needed, and provided, in the following, non-exhaustive, circumstances:

a)  determination of a Patient's medical history or description of ailment or injury;

b)  provision of Patient's rights, informed consent or permission for treatment;

c)  determination and explanation of Patient's diagnosis or prognosis, and current condition;

d)  explanation of procedures, tests, treatment, treatment options or surgery;

e)  religious services and spiritual counseling provided by MCH;

f)  explanation of living wills or powers of attorney (or their availability);

g)  diagnosis or prognosis of ailments or injuries;

h)  explanation of medications prescribed (such as dosage, instructions for how and when the medication is to be taken, and side effects or food or drug interactions);

i)  determination of any condition or allergy of Patient that may affect choice of medication;

j)  explanation regarding follow-up treatments, therapies, test results or recovery;

k)  discharge planning and discharge instructions;

l)  filing of administrative complaints or grievances against MCH or its staff;

m) admitted deaf patients or their companions were to be provided qualified interpreters throughout their stay for all event requiring substantial communication such as post-surgical sessions, doctor rounds, discharge meetings, tests, procedures, therapies and physician-patient meetings; and

n)  any other circumstance in which a qualified sign language interpreter is necessary to ensure a Patient's rights provided by law.

17.    MCH, given the extent of the 2013 Settlement Agreement with the United States Department of Justice, is well aware of its responsibilities to deaf and hard-of-hearing patients and their families.  And is well aware it failed Katrina Rosa, Sheryl Bishop, Tamey Donnelly, Philip Roy and Anna Silva along with countless others.

## COMMUNICATION WITH THE DEAF AND HARD-OF-HEARING

18.    According to the Center for Disease Control, "[a]bout 40% of the sounds in the English language can be seen on the lips of a speaker in good conditions — such as a well-lit room ... But some words can't be read. For example: "bop", "mop", and "pop" look exactly alike when spoken. (You can see this for yourself in a mirror).  A good speech reader might be able to see only 4 to 5 words in a 12-word sentence."

https://www.cdc.gov/ncbddd/hearingloss/language.html (last visited 1/26/2021).

19.    To put the previous paragraph into context, this is what lipreading 5 of every 12 words of that paragraph might look like spoken to a deaf person trying to lip read:

> According the Control, "[a]bout sounds the English can be on the speaker in good—  room ... some can't read. For example: "", "", and "" exactly alike when. (You this for in a mirror).  A speech might be to see only 4 to 5 in a 12-word." (last 1).

20.    It is difficult, in any given situation, to know what words might be lipread and which might not, but, in the above example, for purposes of demonstration, the "important" words were left in the example even though those are, as they are less commonly seen, the words least likely to be understood.  More than that, more than 5 words of each 12-word sequence were left in the example.

21.     Studies by Gallaudet University, The University for the Deaf in Washington D.C., demonstrate the average reading level for an 18-year-old high school graduate, who happens to be deaf, hasn't changed much in the last 50 years, remaining stable between a third and fourth grade level.  To put that into context, the average newspaper, online or otherwise, in the United States is written at an 11th grade level.  The largest American Sign Language Dictionary holds some 5,600 words, while the Oxford English Dictionary has 500,000.

22.     It is easy to see why it is so important to provide appropriate auxiliary aides to the Deaf and Hard-of-Hearing; without such aides, equal access is impossible.

## STATEMENT OF FACTS AS TO PLAINTIFFS SHERYL BISHOP AND KATRINA ROSA

23.     In September 2019, Katrina called 911 as her elderly mother, Sheryl Bishop, appeared to be suffering a seizure. Sheryl was transported, by ambulance, to the nearest hospital, Defendant Monadnock Community Hospital.

24.     While in the ambulance, paramedics, at Katrina's request, notified MCH, via radio, that her mother was Deaf, communicated via ASL, and required a live interpreter.

25.     Upon arrival, and over the course of Sheryl's five and a half hour stay in the MCH's emergency department, Katrina requested, at least three times, that an interpreter be provided. Each time, Katrina was told "interpreters never show up," "they don't usually come," or "they never show up" as explanations for why an interpreter would not be provided.

26.     Instead of providing a live ASL interpreter, as required under the Dauphinais settlement agreement and law, MCH personnel attempted to connect with a virtual interpreter via Video Remote Interpreting (VRI) but, ultimately, just couldn't get the device to work and, so, gave up the effort.

27.     After failing to get the VRI working, MCH personnel repeatedly pressured both Katrina and Sheryl to sign a waiver forgoing Sheryl's right to have an interpreter.  Neither signed the waiver.

28.     Despite their refusal to sign the waiver, MCH insisted on using Katrina, who is hearing, as an interpreter for her ill mother.  Nurse Tonya Morrow wrote, as she took over from Nurse Whitehead, "Daughter at bedside on return, assist with interpreting svcs for patient using ASL."

29.     MCH Medical records clearly indicate that Sheryl is "DEAF NONSPEAKING" and her preferred language as "Sign Languages." Elsewhere the records indicate "congenital deaf mutism" on the problem list.  It is listed an additional three times.

30.     Notably, the medical records where MCH personnel were to document communication barriers, language ability mode expressed, language mode received, and special needs are all left blank but, without any communication access, MCH personnel recorded a "patient narrative" that Sheryl could not and did not provide.

31.     Without any communication access, MCH personnel allegedly provide Sheryl with information she could not understand.  According to the records, "Patient was also told that her of her urine culture are positive she will be notified as she will require antibiotics."  "patient told that her neurologist will follow up with her …"  The record does not state how Sheryl was "told" any of this information or how MCH personnel ensured the information, however told, was understood.

32.     The same MCH medical records indicate Sheryl is "nonverbal with hearing deficit at baseline" and state that Sheryl gave "verbal understanding of discharge/Rx" and "d/c instruct reviewed with pt. and daughter at bedside, verbal understanding of further f/u."

33.    The records are replete with examples of MCH personnel giving and telling Sheryl a great many different things without documenting how understanding of the information was established without any auxiliary aides.

34.    The only documentation about efforts to get an interpreter indicate those efforts started at 3:15 pm, an hour after Sheryl arrived.  Even then, Defendant made only 4 calls over the course of 10 minutes and then gave up.  At this time, Defendant only made 4 calls over 10 minutes despite maintaining a list of 16 individual interpreters and an agency that provides interpreters.

35.    Sheryl was eventually discharged with instructions, which included the important need to follow up with a neurologist, that she did not understand, both because they were in written English and written by hand in sloppy handwriting.

### STATE OF FACTS AS TO PLAINTIFFS TAMEY DONNELLY AND PHILIP ROY

36.    Tamey Donnelly and Philip Roy are a married couple.  Both are prelingually deaf and Philip is in generally poor health.  And, as MCH is the closest medical facility to their home, they have suffered discrimination at the hands of MCH for the past 20 years.

37.    Over their 20 years of being patients at MCH, Tamey and Philip have been denied interpreters more times than they can count.  Rather than provide interpreters, MCH personnel would often force Tamey, whose speaking skills are better than Philip's, to act as interpreter for Philip.  On information and belief, MCH personnel believe, because Tamey can "talk," that she could understand spoken and written English without any auxiliary aides.

38.    With limited English language skills, despite Tamey's best efforts, she could not get Philip's medical needs understood by MCH personnel. At every visit, Tamey asked, often repeatedly, for an interpreter for Mr. Roy's appointments but neither were provided with one.

39.     On one such occasion, Ms. Donnelly called Ms. Meyer, an interpreter she often used, from Monadnock hospital because she had pneumonia and Mr. Roy had a stroke and both of them needed an interpreter and were told that one would not be provided. Over video chat, through Ms. Donnelly's iPhone, Ms. Meyer told the doctor "you need to get an interpreter," but the doctor responded flippantly, dismissed her request, and MCH did not provide Mr. Roy or Ms. Donnelly with an interpreter.

40.     Prior to this, Ms. Meyer had warned Monadnock Community Hospital that refusing to provide Mr. Roy and Ms. Donnelly with an interpreter was illegal. For example, Ms. Meyer contacted Monadnock Community Hospital in 2017 when Mr. Roy underwent a barium swallow test without an interpreter. A barium swallow test is an involved imaging test where a patient ingests barium, and as he swallows, a radiologist takes a series of X-rays to watch the barium moving through the mouth and throat. The process, which takes about an hour, was never adequately explained to Mr. Roy. During this procedure, it is imperative that the radiologists communicate with the patient in order to obtain valid results. At certain points, Mr. Roy would have been instructed to swallow, and at other points he would have been instructed to hold his breath. There are also guidelines patients are supposed to follow prior to undergoing such a test, like no eating and drinking for 6 to 8 hours before the test, which were not adequately communicated to Mr. Roy.  Not following these guidelines can increase risks and side effects.

41.     There is no documentation in any of either Ms. Donnelly or Mr. Roy's medical records that any interpreters were contacted, with one exception, or that any effort was made to provide communication access.  Both Donnelly and Roy's records were requested in the same manner of Mrs. Bishops yet while Mrs. Bishop's document the minimal effort to obtain an interpreter,

neither Donnelly's records nor Roy's give any indication an interpreter was ever requested for either of them with the exception of February 14, 2018.

42.     On information and belief, Monadnock will allege Donnelly and Roy signed waivers foregoing interpreters, yet without proper interpreting services neither Donnelly nor Roy would have understood the waivers.  Further, the waivers, as presented by Monadnock, violate the New Hampshire's Interpreter Statute.  Worse, Tamey and Philip were forced to sign waiver in order to get treatment.

43.     The couple's MCH medical records indicate numerous times, dating back to 2009, that they are both hearing impaired and communicate via sign language.  In fact, every "face sheet" of Philip's records has an alert that he is deaf.  The MCH records also document that Mr. Roy's "wife also deaf."

44.     Over the course of two decades of treatment, neither Donnelly nor Roy were made aware by MCH that a VRI system was available.  The VRI service was never offered to them.

45.     Again, Donnelly and Roy requested interpreters at every visit.  Mr. Roy, being non-verbal, would present a preprinted, yellow card requesting an interpreter.  MCH staff would tell Donnelly and Roy, on various occasions, that the hospital could not afford interpreters.

46.     At one visit to MCH, Donnelly was asked to sign a form stating she would be Roy's interpreter for all visits to Monadnock.  Donnelly's children were asked to sign such a form to act as her interpreter.

47.     Without an interpreter, MCH made notations in Mr. Roy's records, from a February 2018 ER visit, such as "Pt is deaf, wife is nonverbal, wife reports pt has been sick with cold symptoms for approx. 1 week, pt has decreased use of right arm for 1 week, pt fell today with exc of all symptoms.  Wife in room signing pt and writing on paper, awaiting for translator(sic)"

48.     Those records document no effort to use VRI and that MCH, instead of obtaining an interpreter relied on "friend on phone."  "Frined (sic) on phone signs wife who communicates with pt."  MCH utilized Ms. Donnelly's Facetime app to use a family friend to interpreter.

49.     Nursing notes from the February 2018 ER visit state that MCH interpreter services paged 25 individuals in an effort to provide an interpreter, but those notes are contradicted by both the HUC and switchboard department notes as each thought the other was working on getting an interpreter resulting in no one making such an effort for some time.

50.     In fact, no effort to get an interpreter was made until 2 hours after Mr. Roy was admitted and then only 3 of 14 possible interpreters or agencies were called.

51.     Notes of that visit further indicate that Roy attempted to communicate by paper but could not, resulting in the hospital relying on "writing any questions we have in a yes or no format for ease of communication."

52.     Again, despite the hours long failure to even seek an interpreter coupled with the hours long failure to get one, Monadnock never offered or attempted to use VRI.

53.     Ultimately, Mr. Roy was transferred to Cheshire Medical Center.

### STATEMENT OF FACTS AS TO PLAINTIFF ANNA SILVA

54.     Anna Silva, who is prelingually deaf, encountered MCH in November of 2018.  She was with her husband Wayne Silva, who is also deaf.

55.     The Silvas had stopped using Monadnock several years prior because of the hospital's repeated failures to provide communication access, but, here, faced with a medical emergency, they went to Monadnock.

56.     Like the other Plaintiffs, the Silvas provided MCH advanced notice they were coming and would need an interpreter but, when they arrived, the Silvas were told that the interpreters were "all booked up."

57.     With the interpreters "all booked up," MCH attempted to use VRI but the machine did not work.  It was repeatedly unplugged and restarted.  The image on the screen would freeze or pixelate. It froze every 2 or 3 minutes during the 15 minutes effort given to using it.

58.     Finally, Anna, who, again, is herself prelingually deaf, was forced to interpret for her husband.  Doctors would give her notes to read and interpret to her husband.

59.     Mr. Silva was eventually discharged yet Anna had no idea what was wrong, why her husband was prescribed various medications or, ultimately, why he died the next day.

60.     Later, Anna complained, via Video Phone, to MCH about the failure to provide communication access and received a letter from MCH's Patient Experience Coordinator informing Anna that hospital leadership had been made aware of the issues "with adaptive services related to his hearing needs" and would review them.

**ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION**

61.     As described more fully above, Defendant's denial of effective communication during the medical treatment of Plaintiffs or Plaintiffs' family members caused Plaintiffs significant pain, suffering, and emotional distress. Due to Defendant's refusal to provide effective communication, Plaintiffs and/or their family members did not meaningfully understand critical information about diagnoses, prognoses, medication and/or treatment options, and many times Plaintiffs and/or their families were forced to sign consent forms and undergo procedures without understanding the risks and benefits thereof. Plaintiffs were also sent home from treatment at Defendant's facilities without a complete or adequate understanding of the

instructions for follow-up care of the relevant patient or of their prognosis for future improvement, complications or relapse thereby causing significant emotional harm, anxiety and confusion.

62.     As described more fully above, Plaintiffs repeatedly put Defendant's staff on notice that communication was not effective by alerting them of the inadequacy of VRI systems and to their need for qualified ASL interpreters. Yet, despite such notice, Defendant failed and/or refused to provide qualified onsite ASL interpreters, failed and/or refused to ensure that VRI systems were appropriate for each of the Plaintiffs' circumstances, failed and/or refused to ensure that available VRI systems were properly functioning, failed and/or refused to ensure that the Defendant's agents were properly trained and qualified in the use of the VRI systems, and failed and/or refused to fix VRI systems that were not working properly.

63.     Rather, Defendant knowingly limited Plaintiffs to the little communication the Plaintiffs could achieve through vague gestures, cryptic notes, and the few words Plaintiffs could understand through reading lips.  Defendant knowingly limited itself to the little communication it's personnel could understand from "yes and no" answers and nonverbal responses putting all the Plaintiffs in medical jeopardy.

64.     Given its 2013 settlement with the United States Department of Justice, Defendant is aware of its obligations under federal and state law to provide adequate and effective communication for the deaf and hearing and speech unintelligible individuals that visit its medical facilities as either patients or companions of patients.

65.     Upon information and belief, Defendant refuses to hire qualified on-site sign language interpreters as a matter of policy at its hospital and other facilities and insists upon

communication through such inadequate means of communication as handwritten notes, gestures, lip reading, and/or VRI in all cases.

66.     Upon information and belief, the refusal to offer on-site sign language interpreter services to each of the individual Plaintiffs is the result of a policy or practice of Defendant to discourage the use of onsite interpreters without regard to whether VRI services or other methods of communication will provide effective communication, are available or even in working conditions.

67.     Reliance by deaf and hearing and speech impaired individuals upon family members to interpret medical communications for them is unwise and dangerous. Such family members are generally not trained to act as interpreters, particularly in medical and hospital settings. Family members often are untrained in accurately and precisely interpreting and conveying for and to the hearing-impaired individual the complete and accurate content of medical communications. In addition, family members are generally too personally and emotionally involved with the hearing-impaired patient to act impartially and with the emotional detachment that is necessary for qualified sign language interpreters, particularly in medical settings and communications.

68.     As a result of Defendant's failure to ensure effective communication with Plaintiffs, Plaintiffs received care and service that was objectively substandard and that is inferior to care provided to patients and patient family members who can hear.

69.     Furthermore, despite its knowledge and understanding of its legal obligations to provide adequate and effective communication to the Plaintiffs, and its knowledge and understanding that the failure to provide adequate and effective communication to Plaintiffs could and would result in denial of the Plaintiffs' rights under law and in serious and material harm and injury to the Plaintiffs, Defendant knowingly, intentionally and maliciously failed

and/or refused to provide adequate and effective communication to Plaintiffs in an intentional and/or deliberately indifferent violation of Plaintiffs' rights.

70.     It is reasonably foreseeable that each Plaintiff will continue to visit one or more of Defendant's facilities, either by choice or necessity, due to the ubiquity of Defendant's facilities and the proximity of those facilities to the Plaintiffs' homes or neighborhoods.

71.     Based on the foregoing, on information and belief, the actions and omissions of Defendant resulting in harms to Plaintiffs were willful, malicious, intentional, recklessly indifferent and undertaken with an evil mind and motive and with disregard for and deliberate indifference to the legal rights of Plaintiffs under federal and state law and the substantial risk of serious and material harms to the Plaintiffs. Therefore, to the extent allowed by any applicable law, Defendant's actions would warrant, in addition to all other appropriate relief, the imposition of punitive, exemplary damages, or enhanced compensatory damages to punish the Defendant for its wrongful conduct and to deter other similarly situated persons or entities from similar future conduct.

## FEDERAL CLAIMS

## COUNT I

## DEFENDANT MCH VIOLATED TITLE III OF THE AMERICANS WITH DISABILITIES ACT AS TO ALL PLAINTIFFS

72.     Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

73.     Plaintiffs are substantially limited in the major life activities of hearing or related to individuals so limited. Accordingly, they are considered individuals with a disability as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2).

74.     Defendant owns, leases, and/or operates a place of public accommodation as defined under Title III of the ADA, 42 U.S.C. § 12181(7)(F).  Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations . . ." 42 U.S.C. § 12182(a).

75.     Pursuant to Title III of the ADA and its implementing regulations, a public accommodation cannot deny participation or offer unequal or separate benefit to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. §§ 36.202.

76.     Pursuant to Title III of the ADA and its implementing regulations, a public accommodation shall furnish appropriate auxiliary aids and services to ensure effective communication with individual with disabilities. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(b)(1).

77.     Pursuant to Title III of the ADA and its implementing regulations, a public accommodation, in choosing the type of auxiliary aid or service to ensure effective communication, must consider the "method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii).

78.     Pursuant to Title III of the ADA and its implementing regulations, in order to be effective, the type of auxiliary aid or service provided by the public accommodations "must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 36.303(c)(1)(ii).

79.     Pursuant to Title III of the ADA and its implementing regulations, when a public accommodation provides VRI service, it must ensure that the service includes all the following

criteria: "(1) [r]eal-time, full-motion video and audio over a dedicated high-speed, wide bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) [a] sharply delineated image that is large enough to display the interpreter´s face, arms, hands, and fingers, and the participating individual´s face, arms, hands, and fingers, regardless of his or her body position; (3) [a] clear, audible transmission of voices; and (4) [a]dequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 36.303(f).

80.      Defendant discriminated against the individual Plaintiffs on the basis of their disabilities by denying access to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and/or accommodations of their place of public accommodation and equal opportunity to participate in and benefit from Defendant's health care services in violation of 42 U.S.C. §§ 12181, et seq.

81.      Defendant discriminated against the individual Plaintiffs by failing to ensure effective communication through the provision of qualified in-person interpreters. On information and belief, the refusal to offer in-person interpreter services is as a result of a policy or practice of Defendant to discourage the use of in-person interpreters without

regard to whether VRI services will provide effective communication and no matter the risk to patient care.

82.      As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

## COUNT II

## DEFENDANT MCH VIOLATED SECTION 504 OF THE REHABILITATION ACT AS TO ALL PLAINTIFFS

83.     Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

84.     Plaintiffs are substantially limited in the major life activities of hearing or are close relatives to those so limited. Accordingly, they are individuals with a disability as defined under Section 504, as amended, 29 U.S.C. § 708(20)(B).

85.     During all relevant times, Defendant was and continues to be a recipient of federal financial assistance, including but not limited to its acceptance of Medicare and Medicaid.

86.     Pursuant to section 504, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be exclude from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

87.     Defendant has discriminated and continues to discriminate against Plaintiffs solely on the basis of their disability by denying them meaningful access to the services, programs, and benefits the Defendant offers to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

88.     Defendant discriminated against the individual Plaintiffs by failing to ensure effective communication through the provision of qualified in-person interpreters.

89.     Defendant has discriminated and continues to discriminate against Plaintiffs solely on the basis of their disability by denying them meaningful access to the services, programs, and

benefits the Defendant offers to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

90.    As a result of Defendant's failure to ensure effective communication, the individual Plaintiffs have suffered and will continue to suffer mental anguish, fear, isolation, suffering, embarrassment, and humiliation.

91.    As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

## COUNT III

## DEFENDANT MCH VIOLATED THE ADA 42 USC § 12182(b)(1)(E), AND THE REHABILITATION ACT OF 1973 § 505(a)(2), 29 U.S.C.A. § 794(a)(2) BY ENGAGING IN ASSOCIATIONAL DISCRIMINATION AGAINST PLAINTIFF KATRINA ROSA

92.    Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

93.    Both the Rehabilitation Act and the ADA prohibit discrimination against those associated with someone with a qualifying disability.  42 USC § 12812 states: "It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."

94.    Anna Silva is a qualified disabled individual under both Acts and her daughter, Katrina Rosa is a person aggrieved as defined by the Acts.

95.    By forcing an untrained, emotionally upset daughter to act as interpreter, the

Defendant violated both the ADA and the Rehabilitation Act proximately causing harm to these plaintiffs.

96.    As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

## STATE LAW CLAIMS

## COUNT IV

## DEFENDANT MCH VIOLATED NEW HAMPSHIRE HUMAN RIGHTS LAW, RSA 354-A, AS TO ALL PLAINTIFFS

97.    Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

98.    Plaintiffs are persons with a disability as defined by New Hampshire RSA 354-A.

99.    Defendant owns, leases, or operates a place of public accommodation as defined under New Hampshire RSA 354-A.

100.    New Hampshire RSA 354-A:16 provides that "The opportunity for every individual to have equal access to places of public accommodation without discrimination because of age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin is hereby recognized and declared to be a civil right."

101.    Further, New Hampshire RSA 354-A:17 states, "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof; or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect

that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin; or that the patronage or custom thereat of any person belonging to or purporting to be of any particular age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin is unwelcome, objectionable or acceptable, desired or solicited.

102.    Defendant discriminated against the individual Plaintiffs as set out above by denying them equal access to the services, programs, and benefits by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of New Hampshire RSA 354-A:17. It is likely that the discrimination will recur.

103.    As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

## COUNT V

## DEFENDANT MCH VIOLATED NEW HAMPSHIRE CONSUMER PROTECTION LAW, RSA 358-A, AS TO ALL PLAINTIFFS

104.    Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

105.    Defendant MCH is, and was at all relevant times, engaged in commerce in New Hampshire as defined by New Hampshire RSA 358-A in that it provides medical services in exchange for payment.

106.    Plaintiffs were consumers of Defendant's medical services.

107.    On its website, Monadnock Community Hospital advertises itself as a hospital "committed to providing meaningful and equal access to medical services and programs by facilitating communication of essential information to all of our patients and/or companions in a

language and manner they understand." MCH's website further states assistive services and devices for the deaf and hard of hearing will be provided on a 24-hour basis and will be provided free of charge. As alleged throughout this complaint, this promotional material is false.

108.    Defendant made these misrepresentations about communication access knowingly and willingly thus they constitute deceptive, unfair and false acts or practices in trade or commerce.

109.    As a proximate result of the false promotion of services and general violation of the New Hampshire Consumer Protection Act, Plaintiffs suffered harm as set out above.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, the Plaintiff respectfully prays that this Court grant the following relief against the Defendants:

A.    Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures have subjected Plaintiffs to discrimination in violation of Title III of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973;

B.    Permanently enjoin Defendants from any practice, policy and/or procedure which will deny Plaintiffs equal access to, and benefit from Defendants services or which deny Plaintiff s effective communication with Defendants. This includes entering a permanent injunction ordering Defendants:

1.    To cease discrimination against Plaintiffs and other Deaf or Hard-of-Hearing patients and their families;

2.    To promulgate and comply with policies and procedures to ensure that Defendants and their staffs do not discriminate against individuals who are deaf and hard of hearing;

3.    To promulgate and comply with procedures to ensure that Defendants will provide and pay for interpreter services when needed by individuals who are deaf or hard of hearing in all services offered by Defendants;

4.    To promulgate and comply with procedures to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective

communication. This notification will include posting explicit and clearly worded notices that state that the Defendants will provide sign language interpreters, TTYs and/or other communication services to ensure effective communication with deaf or hard of hearing persons;

C.      Schedule a trial by jury;

D.      Enter a judgment in favor of Plaintiffs awarding any and all relief available under law

to the maximum extent allowed by common law, state and federal statutes, and the

Constitutions of New Hampshire and the United States of America, including but not

limited to the following:

1.      Compensatory damages;

2.      Treble damages pursuant to NH RSA 358-A:10;

3.      Enhanced Compensatory damages;

4.      Punitive damages;

5.      All damages available pursuant to NH RSA 151:30;

6.      Reasonable costs, interest and attorneys' fees; and,

E.      Award any and all other relief that may be just, necessary and appropriate.

Respectfully submitted,

Katrina Rosa, Sheryl Bishop, Tamey Donnelly, Philip Roy and Anna Silva

By their attorney,

RED SNEAKER LAW, PLLC.

Dated:  February 12, 2021          By:/s/   Kirk C. Simoneau (#19291)
                                   77 Central Street
                                   Manchester, NH 03101
                                   (603) 669-5000
                                   kirk@redsneakerlaw.com